UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BILLY JOE BENNETT,

                Petitioner,

v.

SHERMAN CAMPBELL,

                Respondent.

_____/

Case No. 4:19-cv-13483

Stephanie Dawkins Davis
United States District Judge

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT
OF HABEAS CORPUS, (2) DENYING CERTIFICATE OF
APPEALABILITY, (3) DENYING PERMISSION TO APPEAL IN FORMA
PAUPERIS, and (4) DENYING MOTION TO STAY (ECF No. 16)**

Billy Joe Bennett ("Petitioner") filed this *pro se* habeas petition for a writ of

habeas corpus under 28 U.S.C. § 2254.  Petitioner was convicted after a jury trial

in the Oakland Circuit Court of first-degree murder.  MICH. COMP. LAWS

§ 750.316.  He was sentenced to life imprisonment.  The Court interprets the *pro se*

pleading to be raising the following exhausted claims:  (1) Petitioner was denied

the effective assistance of counsel for his trial attorney's failure to challenge the

DNA evidence, and for disclosing prejudicial information regarding Petitioner's

prior bad conduct, and (2) the prosecutor committed misconduct by making

improper comments during closing argument, and by improperly eliciting evidence

regarding Petitioner's employment history and drug use.[1]

The Court will deny the petition because the claims are without merit. The

Court will also deny a certificate of appealability and deny leave to appeal *in forma*

*pauperis*.

## I.     BACKGROUND

The Michigan Court of Appeals summarized the facts of the case:

> In 1988, Elnora Barrager was murdered inside her
> home in Pontiac, Michigan.  She was 88 years old at the
> time.  Before her death, she was subjected to physical
> trauma.  There were multiple bruises, scrapes, and
> abrasions on her face, which suggested application of
> force or a blunt impact.  The medical examiner opined
> that some of the injuries to Barrager's head were
> consistent with an impact of her head against a wall.
> Barrager also had abrasions on her right shoulder,
> scraped skin on top of her humerus, bruises to her
> clavicle, a broken rib, and injuries to her hip bone, knees,
> and ankles.  There was also evidence that she was
> sexually assaulted.  At the scene, the police located
> suspected blood stains on Barrager's bedsheets and her
> nightgown.  Although the crime was initially
> investigated, the police were unable to determine who
> had killed Barrager.

---

[1] The Court does not interpret the somewhat difficult to follow petition to be asserting the additional allegations raised in Petitioner's motion for relief from judgment.  But to the extent Petitioner is attempting to raise those claims in his habeas petition, they are barred from habeas review because Petitioner did not pursue those claims after the trial court denied his motion for relief from judgment in the state appellate courts, and he no longer has a procedural mechanism to exhaust those claims.  *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Landrum v. Mitchell*, 625 F.3d 905, 918 (6th Cir. 2010).  Nor has Petitioner attempted to demonstrate cause and prejudice to excuse his procedural default.

In 2005, a police detective was assigned the murder investigation. The record reflects that he requested a review of the physical evidence in 2006, which resulted in a partial DNA profile from the blood evidence on Barrager's nightgown. However, no identifications were obtained. Subsequently, in 2015, the police detective asked the Michigan State Police crime laboratory if a more detailed profile of the previously submitted samples could be obtained due to the development of technology in the interim years. This time, the partial DNA profile previously obtained was determined to be associated with Bennett. The police detective obtained a search warrant for a buccal swab from Bennett, and further forensic testing matched Bennett's DNA to the DNA located at the scene.

After Bennett was arrested he acknowledged knowing Barrager, asserting he had assisted her with fixing her lawnmower in 1985. He did not recall any further contacts or rendering assistance to Barrager after that time and was unsure whether he had entered her home any time after 1985. The police detective also questioned Constance Resendez, who had been in a romantic relationship with Bennett from 1987 to 1988. According to Resendez, she was not initially honest with the police when questioned in 1990; however, when she was questioned in 2015, she implicated Bennett.

At trial, Resendez testified that in March 1988, Bennett was driving, with Resendez in the front passenger seat and James Ruperd in the backseat of the vehicle, when it stopped running and Bennett pulled over to the curb in an area near the trailer park where they lived. The vehicle would not restart. Initially, Bennett and Ruperd indicated they would go to one of the nearby houses to use the telephone, but then stated they would break into one of the homes. Resendez testified that she wanted no part in their activities, so she exited the vehicle and began walking in the direction of the trailer park. She saw Bennett and Ruperd walk up to a house,

3

heard a "big bang," and heard Bennett loudly yelling "Hey, hey" at the door of the house. Resendez opined that it took her approximately 15 minutes from the time she left the vehicle to arrive home. Approximately 15 minutes after arriving home, Resendez asserted that Bennett entered the mobile home with his right hand bleeding and wrapped in a cloth. Resendez claimed that she did not question him regarding his hand injury because their relationship was abusive. She testified that Bennett told her that he stole a purse. Resendez testified that sometime later, while visiting Bennett's family in Newberry, Michigan, Bennett verbally told her he was "lying low" because Ruperd had killed an old woman at the house he and Ruperd broke into.

At trial, Bennett testified that he did not kill Barrager, that his blood was in her home because he had cut his hand while repairing a light fixture for her, and that he had no financial motive to burglarize Barrager's home because he was gainfully employed. The jury, however, convicted him of first-degree murder.

*People v. Bennett*, 2018 WL 1436965, at *1-2 (Mich. App. March 22, 2018).

Following his conviction and sentence, Petitioner filed a claim of appeal in the Michigan Court of Appeals. His appellate counsel filed a brief on appeal that raised two claims:

I. The United States and Michigan Constitutions guarantee a criminal defendant the right to effective assistance of counsel. Mr. Bennett's trial counsel rendered an unconstitutionally deficient performance by failing to investigate and present an essential defense, thereby prejudicing Mr. Bennett.

II. Mr. Bennett was denied a fair trial due to the ineffective assistance of counsel when counsel introduced evidence of a breaking and entering

4

conviction that would not have been otherwise
admissible, when counsel introduced evidence of an
irrelevant police chase that would not have been
otherwise admissible, by enquiring about his employment
status in 1988 that was both irrelevant and inadmissible,
and by failing to object to the evidence when Mr. Bennett
was questioned on the same by the prosecutor; the
prosecutor committed misconduct by stating that Mr.
Bennett was motivated to commit larceny by drug use by
failing to prove that Mr. Bennett was addicted to drugs
and defense counsel was ineffective for failing to object
to the same.

The Michigan Court of Appeals affirmed Petitioner's convictions in an

unpublished opinion.  *Id.*  Petitioner filed an application for leave to appeal in the

Michigan Supreme Court that raised the same claims presented to the Court of

Appeals.  The Michigan Supreme Court denied the application for leave to appeal

by standard order.  *People v. Bennett*, 920 N.W.2d 138 (Mich. 2018) (Table).

Petitioner returned to the trial court and filed a *pro se* motion for relief from

judgment that raised three claims:

I. Did the government deny defendant his rights to
confrontation, fundamental fairness, and a trial at all by
covertly substituting witnesses in between direct and
cross-exam?

II. Did Judge Bowman constructively deny defendant
counsel as well as numerous other basic rights by abusing
his discretion in refusing to substitute appointed counsel?

III. Did appellate counsel violate defendant's guarantee
to effective assistance by raising inherently hopeless
claims while ignoring issues that would have resulted in
reversal of conviction?

5

The trial court denied the motion for relief from judgement, finding that the claims lacked merit and Petitioner failed demonstrate good cause and actual prejudice for failing to raise the new claims during his direct appeal.  (ECF No. 11-17, PageID.1328-33).  Thereafter, Petitioner filed numerous additional pleadings in the trial court seeking to overturn his conviction and obtain other forms of relief. The trial court denied all the motions.  (*Id.* at PageID.1386-89, 1890-91, 1395-98, 1402-06, 1412-15, 1424-26, 1440-42, 1448-50, 1455-56).  Petitioner never pursued an appeal of the denial of his motion for relief from judgment or his other post-conviction motions in the Michigan Court of Appeals or Michigan Supreme Court.

## II.    STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d) curtails federal habeas review of state convictions for claims adjudicated on the merits by state courts.  A habeas petitioner must generally demonstrate that the state court adjudication was "contrary to" or "involved an unreasonable application of" clearly established Supreme Court law. A decision is "contrary to" clearly established Supreme Court law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision

unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409.

Under this standard, a federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## III.  Discussion

### A.  Ineffective Assistance of Counsel

Petitioner first asserts that his trial attorney rendered ineffective assistance of counsel. The *pro se* habeas petition seems to raise a subset of the allegations of ineffective counsel that were raised on direct appeal. He asserts that his trial attorney failed to challenge the DNA evidence used to identify him as the perpetrator by failing to seek a defense expert to investigate whether an effective challenge could be mounted in various ways. He also asserts that his trial attorney elicited prejudicial testimony that Petitioner was involved in a prior breaking and entering and an automobile accident, when evidence of those events would have been otherwise inadmissible. After reciting the standard governing ineffective

7

assistance of counsel claims, the Michigan Court of Appeals rejected these

allegations on the merits:

> Bennett first contends his lawyer was ineffective for failing to secure an expert to perform an independent evaluation of the DNA evidence and to refute the testimony of Heather Vitta, the prosecution's forensic expert. "Decisions regarding ... whether to call or question witnesses are presumed to be matters of trial strategy," and "the failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v. Solloway*, 316 Mich. App. 174, 189 (2016) (citations, quotation marks, and alterations omitted). Bennett's theory was that there was an innocent explanation for the presence of his blood at the scene. Vitta's testimony that the DNA testing could only identify the source of the blood, not the length of time it had been present was, therefore, consistent with Bennett's theory. Further, Bennett provides no offer of proof that an independent expert would have provided any alternative or additional information to support Bennett's theory of the case or to exonerate him of the charges. Thus, regardless of whether it was proper trial strategy for Bennett's lawyer to not retain an independent expert, Bennett has failed to show that he was deprived a substantial defense by the absence of an independent DNA expert.
>
> Similarly, Bennett's assertion that the failure to match his blood type to the samples, rather than his DNA, comprised error or an avenue to be pursued by his lawyer is without merit. Vitta testified the blood, not skin cells or other bodily fluid, yielded the DNA profile. Again, however, Bennett has not presented an offer of proof that such evidence would have been favorable to him should it have been presented.

*      *      *

Bennett further contends his lawyer was ineffective for stipulating to the admission of certain evidence at trial, suggesting it improperly bolstered the prosecution's case.  At trial, the prosecutor and Bennett's lawyer stipulated that the DNA evidence was properly processed and maintained.  Bennett contends that stipulation demonstrates that his lawyer was ineffective because attacking these aspects of the evidence could have called into question the validity of the results obtained.  Bennett, however, has made no allegations  or presented an offer of proof to suggest any anomaly or impropriety in the maintenance of the records or evidence to contradict the stipulation.  As such, he has failed to establish the factual predicate for this claim. *People v. Hoag*, 460 Mich. 1, 6 (1999).

*        *        *

Next, Bennett claims that his lawyer was ineffective for revealing Bennett's convictions for a 1989 breaking and entering and his drunk driving and malicious destruction of property convictions.  It is recognized:

> Every criminal defense attorney must make strategic and tactical decisions that affect the defense undertaken at trial. Most criminal defense attorneys have a variety of options from which to choose that affect, if not determine, how the jury understands and comprehends the case. Many of these options in a particular case may be contradictory, confusing, incredible, or simply poor.  The role of defense counsel is to choose the best defense for the defendant under the circumstances. [*People v. Pickens*, 446 Mich. 298, 324-325 (1994).]

Resendez was the prosecution's primary witness. Her testimony placed Bennett at the scene of the crime and established that his hand was bleeding.  As such, it was incumbent on Bennett's lawyer to challenge her

9

credibility.  In undertaking this task, Bennett's lawyer
elected to reveal Resendez's involvement with Bennett in
a breaking and entering that resulted in both of them
being convicted in 1989.  Although prejudicial to
Bennett, the testimony also called into question
Resendez's credibility because it involved a crime of
theft and served to help postulate that Resendez's
testimony against Bennett was motivated by revenge or
retribution.

    Similarly, by raising questions regarding Bennett's
1988 motor vehicle accident, his lawyer challenged
Resendez's credibility by contradicting the timeline and
factual assertions made by Resendez regarding her time
spent with Bennett in Newberry, Michigan following the
accident.  Questioning the accuracy of Resendez's
recollection of these events served to attack her
contention regarding verbal statements made by Bennett
to her regarding Barrager's murder.  Thus, it is likely that
the decision was based on trial strategy.  See *People v.
Armstrong*, 100 Mich. App. 423, 426 (1980) ("Even the
intentional introduction by defense counsel of a prior
criminal record does not constitute a serious mistake of
counsel depriving defendant of a fair trial or of effective
assistance of counsel where the record was introduced as
a trial tactic.").  Moreover, Bennett cannot attribute the
difficulties he encountered regarding any incriminatory
statements when testifying regarding these events, given
his decision to testify was contrary to the advice of his
lawyer.  Premised on the fact that revelation of this
information was a matter of trial strategy and the
existence of DNA evidence linking Bennett to the crime
scene established Bennett's guilt, we cannot concluded
that Bennett was unduly prejudiced or that the jury was
unduly influenced with regard to the disclosure of
information regarding Bennett's prior convictions.
Furthermore, during its final instructions to the jury, the
trial court indicated that evidence or testimony pertaining
to other crimes involving Bennett had limited use and
could not be used to suggest his bad character or

> predisposition to engage in criminal behavior.  See
> *People v. Mahone*, 294 Mich. App. 208, 212 (2011)
> ("Jurors are presumed to follow their instructions, and it
> is presumed that instructions cure most errors.").

*Bennett*, 2018 WL 1436965, at *2-5 (footnotes omitted).

To establish ineffective assistance of counsel, Petitioner must show both that: (1) counsel's performance was deficient, i.e., "that counsel's representation fell below an objective standard of reasonableness" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  The test for prejudice is whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  The Michigan Court of Appeals did not unreasonably apply this established standard in denying Petitioner's claim.  With respect to the failure to challenge the DNA evidence, Petitioner's claim ignores that fact that his trial defense, presented by way of his own testimony, was that his blood innocently found its way onto the victim's belongings because he had cut himself repairing a lightbulb at her house prior to her murder.

11

Petitioner testified at trial that at the end of March 1988, while working for a realty company, he performed some work in and around the victim's house. The work included clearing branches in the front yard, unclogging the kitchen sink, and fixing a light in her bedroom. (Tr. 2/16/16, at 6-8). Petitioner testified that the bulb exploded in his hand while fixing the light, , shocked him, and he likely cut his finger. *Id*. Petitioner explained that to fix the light, he and his co-worker pulled the victim's bed away from the wall, suggesting an explanation for how his blood was later found. *Id*. Petitioner testified that he learned of the victim's death from an acquaintance about a week after the incident. *Id*. at 10-11, 50. The prosecutor's expert, meanwhile, conceded that she could not tell when or how Petitioner's blood was deposited on the samples taken from the victim's belongings. (Tr. 2/2/16 T, at 136). Accordingly, Petitioner's testimony, if believed, fully accounted for the DNA evidence.

Of course, it was permissible for defense counsel to have run both defenses – that (a) the prosecutor did not prove that the DNA came from Petitioner, and (b) that if it did, it was innocently transferred prior to the murder. But effective assistance did not require counsel to present every available defense. It was reasonable for the state court to conclude that counsel performed effectively by refraining from challenging the DNA evidence when his own client provided an innocent explanation for how his blood appeared at the scene. Although "in some

12

cases counsel would be deemed ineffective for failing to consult or rely on experts, . . . that formulation is sufficiently general that state courts would have wide latitude in applying it." *Richter*, 562 U.S. at 106. *Strickland* does not require an equal and opposite expert from the defense for every prosecution expert. *Id*. at 111. "There are . . . 'countless ways to provide effective assistance in any given case,'" and "[r]are are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id*. at 106 (quoting *Strickland*, 466 U.S. at 689).

Given Petitioner's concession that he bled in the victim's bedroom shortly before the incident, trial counsel's manner of handling the DNA issue constituted reasonable trial strategy. The use of a defense expert to add an alternative defense theory could have "transform[ed] the case into a battle of the experts," and to support a defense that the prosecution did not prove its case, it is sometimes "better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Richter*, 562 U.S. at 108-09.

Moreover, even on direct appeal, Petitioner's appellate counsel failed to proffer any evidence that an expert witness existed who would have testified in Petitioner's favor or challenged the prosecutor's expert's conclusions. In his appellate brief, Petitioner's counsel only suggested, "[a] defense expert *may have* provided expert support for contesting the DNA collection procedures, the testing

13

protocol, or the source of the DNA.  Additionally, an expert *could have* introduced testimony that it was possible for the police to recover Mr. Bennett's DNA from the scene of the murder despite Mr. Bennett not being there at the time of the murder, thereby establishing reasonable doubt on whether he did commit the offense." (Brief on Appeal, p. 17. (emphasis added)).  Neither Petitioner's brief on appeal nor the motion for remand, however, contained an affidavit or other such evidentiary proffer from such a proposed defense expert.  In the absence of any evidence that there was an expert witness available to testify favorably to Petitioner's defense, it was reasonable for the Michigan Court of Appeals to find that Petitioner failed to demonstrate deficient performance.  "It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Burt v. Titlow*, 571 U.S. 12, 23 (2013) (quoting *Strickland*, 466 U.S. at 689).

Next, though the allegations in the *pro se* habeas petition are scattered and somewhat difficult to follow, it appears Petitioner primarily focuses on two additional aspects of his counsel's performance.  He asserts that his counsel was ineffective for eliciting evidence that he committed a breaking and entering in 1989, and he asserts that his counsel also elicited damaging evidence that he was involved in an automobile accident that resulted in further criminal charges.

14

With respect to the breaking and entering, counsel used that incident to suggest that prosecution witness Resendez was not credible and even more, it created a motive to falsely accuse Petitioner of the instant crime. In the opening statement, counsel correctly informed the jury that the key to the case was Resendez's credibility. (Tr. 2/10/16, at 41). Resendez was the only witness who provided testimony that placed Petitioner at the scene and time of the crime, and she described how Petitioner had a cut on his hand when he returned home later that night. But to put meat on the bones of that defense, defense counsel had to find a motive for Resendez to falsely accuse Petitioner,

Accordingly, counsel cross-examined Resendez regarding the 1989 breaking and entering incident, as well as her purported use of the proceeds from that crime. Resendez acknowledged that she had served time in jail for as a result of that incident. (Tr. 2/11/16, at 179). She also admitted that she was charged for using someone else's checks or credit cards in relation to the incident. (Tr. 2/17/16, at 7). At Petitioner's trial, Resendez claimed that she was merely present when Petitioner committed the other breaking and entering, and she maintained that she was wrongfully convicted when the jury did not believe her. She testified that she had been separated from her daughter while she was in jail for that crime. (Tr. 2/11/16, at 210-215). This testimony allowed defense counsel to argue that

Resendez had a motive to retaliate against defendant for getting her in trouble for the other incident.

Counsel further suggested that Resendez and James Ruperd might even have been the possible perpetrators of the present murder. Petitioner testified that that Resendez and Ruperd were not working at the time of the murder, and Petitioner suggested to them that they see if the victim needed work down around her house. (Tr. 2/12/16, at 184, 200-01; Tr. 2/16/16, at 19, 32). Defense counsel apparently reasoned that the jury was more likely to believe the defense theory that perhaps Resendez and Ruperd murdered the victim when they solicited her for work if they knew that Resendez had committed a breaking and entering a year later.

During closing argument, defense counsel argued that Resendez was the one who was using crack cocaine at the time of the murder, and that both she and Ruperd were not working. (Tr. 2/18/16 T at 48, 49-50, 63). Defense counsel also argued that though Resendez testified that she stopped using drugs in 1989, her conviction for breaking and entering and using the stolen check book suggested that was not true. (Tr. 2/18/16, at 65-66). While this tactic, of course, also meant the jury would learn that Petitioner was involved in the other breaking and entering as well, it is reasonable to conclude that counsel's decision to use it against

16

Resendez and suggest a motive for her to falsely testify against Petitioner was, on balance, more advantageous to the defense than harmful.

Next, with respect to the automobile accident, on direct-exam Resendez testified that while she and Petitioner were camping in Northern Michigan from May until July 1988, Petitioner told her that they were lying low because Ruperd had killed the woman in the home that they had broken into.  (Tr. 2/11/16, at 156).  In an attempt to rebut this testimony, defense counsel elicited testimony regarding Petitioner's May 1988 automobile accident and related charges to show that Resendez's account was false.  During cross-examination, Resendez testified that Petitioner had been in a serious car accident in mid-May of 1988, during which a pole punctured his neck.  (Tr. 2/11/16, at 189, 277).  She conceded that she visited him in the hospital after this injury and that he also spent time in jail after the accident.  *Id*. at 227, 277.

Petitioner testified that he broke his neck during the accident, and he was placed in a halo for a month.  (Tr. 2/12/16, at 190-192).  He testified that he was in the hospital and jail, and that after he bonded out of jail, he went to Northern Michigan to recuperate at his father's residence.  *Id*. at 192-193.  Resendez later picked him up so he could attend a court hearing in Pontiac.  *Id*. at 43, 195.  This account was corroborated by testimony from Petitioner's brother.  *Id*. at 91, 92.  Defense counsel used this testimony during closing argument to assert that

Resendez's account of Petitioner "laying low" was false.  (Tr. 2/18/16, at 50-53).

As with the prior breaking and entering, though the testimony and argument meant

that the jury learned of the prior accident and related charges, it is reasonable to

conclude that defense counsel made a competent professional calculation that the

benefits outweighed the risks.

The Michigan Court of Appeals' rejection of this claim therefore did not

involve an unreasonable application of the *Strickland* standard.

B.      Prosecutorial Misconduct

Petitioner's second claim asserts that the prosecutor committed misconduct.

He asserts that during closing argument and throughout trial the prosecutor

vouched for the credibility of his witnesses and expressed a personal belief in

Petitioner's guilt.  He further asserts that the prosecutor presented false testimony

from Resendez and prejudicial evidence regarding his drug use and employment

history.

In reviewing this claim for plain error, the Michigan Court of Appeals found

that the prosecutor did not commit misconduct:

> Bennett also asserts the prosecutor engaged in
> misconduct by querying Bennett's employment history as
> a means to suggest he had a motive to commit a breaking
> and entering of Barrager's home.  In addition, the
> prosecutor implied that Bennett's need for additional
> money was to support his illegal drug habit.  Bennett
> additionally argues that his trial lawyer was ineffective
> for failing to object to this testimony and evidence.  "In

18

order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v. Bennett*, 290 Mich. App. 465, 475 (2010). Because he did not object to the prosecutor's questioning or comments during closing argument, this issue is unpreserved. Unpreserved prosecutorial misconduct claims are reviewed for plain error affecting the defendant's substantial rights. *People v. Thomas*, 260 Mich. App. 450, 453-454 (2004). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Bennett*, 290 Mich. App. at 475-476 (citation and quotation marks omitted). Moreover, this Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Id*. at 476.

In general, "[p]rosecutors are accorded great latitude regarding their arguments and conduct." *People v. Bahoda*, 448 Mich. 261, 282 (1995) (citation and quotation marks omitted). "Prosecutors are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v. Bailey*, 310 Mich. App. 703, 722 (2015) (citation and quotation marks omitted).

Bennett's lawyer raised the issue of Bennett's employment on cross-examination of Resendez. Bennett continued to focus on his employment by offering the testimony of Shirley Byars and detailing his employment history while on the witness stand. Part of Bennett's theory at trial pertained to his assertion that because he was gainfully employed and earning wages he had no financial need to engage in a breaking and entering or larceny. Thus, the prosecutor's further questioning of Bennett regarding his employment did not constitute misconduct, as "[a] prosecutor may fairly respond to an issue raised by the defendant." *People v. Brown*, 279 Mich. App. 116, 135 (2008).

19

Bennett also asserts misconduct by the prosecutor in questioning Bennett regarding specific time periods pertaining to his employment, during which Bennett revealed that he was in jail.  Bennett took the witness stand against the advice of his lawyer.  He testified regarding his work history, implying he had financial means available to him, obviating any need to engage in a larceny.  Once an issue is raised, the door is open "to a full, not just a selective, development."  *People v. Allen*, 201 Mich. App. 98, 103 (1993).  Bennett's lawyer may have elected not to object to this testimony in order not to draw unwanted or prolonged attention to the brief reference rather than highlight this part of Bennett's testimony.  *Bahoda*, 448 Mich. at 287 n. 54.  This Court "will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence."  *People v. Unger*, 278 Mich. App. 210, 242-243 (2008).  Further, this revelation by Bennett was merely cumulative information already elicited.  Thus, Bennett is unable to demonstrate that elicitation of the testimony comprised prosecutorial misconduct, that his lawyer was ineffective for failing to object to the query, or that he was prejudiced by the comment, particularly in light of the trial court's instructions to the jury regarding references to Bennett's prior criminal history and its limited usage.

Bennett also challenges the prosecutor's solicitation of testimony from Bennett's brother that Bennett had a "crack habit."  Bennett argues that the testimony was hearsay.  He also contends that it was improper for the prosecutor to reference it during closing argument.  Bennett's use of cocaine was initially asserted by Resendez.  Thereafter, the following exchange occurred between the prosecutor and Bennett's brother during trial:

> Q. Did your brother have a drug problem [at the time of the murder]?

20

A. Yes.

Q. Crack?

A. Yes.

Q. He did a lot of it, right?

A. I wasn't there, but—I don't know how much his habit was.

Q. It was a habit?

A. That's what I've heard from other family.

Q. And do you know if that was costing him a lot of money to maintain that habit?

A. I'm sure it would.

Q. Do you know if he did any drugs when he was up there with you guys, up in Newberry?

A. No, he did not.

Thus, Bennett's brother affirmatively testified that Bennett used cocaine, but could not definitively assert personal knowledge of the extent of his drug use. As such, hearsay was not elicited. Bennett's brother's assertion was also cumulative to testimony elicited from Resendez. Bennett's drug use was a peripheral issue at trial to suggest a motive in response to Bennett's contention that his employment precluded his need to obtain money from the victim through a larceny. In addition, MRE 404(b) precludes the use of "[e]vidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith," but such evidence can still be used for other purposes, such as proof of a motive to commit the crime.

21

*People v. Knox*, 469 Mich. 502, 508-509 (2004), quoting MRE 404(b).  Therefore, because the above testimony did not comprise prosecutorial misconduct, Bennett's lawyer was not ineffective for failing to object.  See *People v. Hardy*, 494 Mich. 430, 445 (2013).

Bennett next takes issue with comments by the prosecutor in closing arguments. The prosecutor stated:

> Everything you hear from Billy Bennett is based on what Billy Bennett is telling you.  He's telling you.  He said, you know, he's a family man, he was, you know, helping [Resendez], he was, you know, he was working two jobs, you know, and—and then Mr. Taylor sells, "Well [Resendez] was kind of slurring him, she said he had a, you know, crack habit."  But that's not the only place you got that little bit of information.  You got that from Billy's own brother, Bob.  Bob's the one that said, "Yeah, he had a crack habit."  And I asked him, "Was that expensive?"  And he said, "You know, I imagine it was."  We don't have to show a motive, but ladies and gentlemen, I mean, he's a drug addict, he's a crack addict.  And maybe it's—it costs him more than what he makes to keep his habit going.  The intent was to commit a larceny. He didn't pick up that wallet, because he'd ripped out that light....

Bennett's theory of the case was that he lacked a motive to commit the breaking and entering and larceny because he was gainfully employed and did not require the money.  The prosecutor's comments, particularly when viewed in context, served to dispute Bennett's theory of defense and suggested weaknesses in Bennett's case.  Thus, they were a fair response to an issue raised by Bennett. See *Brown*, 279 Mich. App. at 135. Consequently, the comments did not constitute prosecutorial misconduct.  Further, the trial court specifically instructed the jury that comments or

22

> statements by the trial lawyers did not comprise
> evidence, which the jury presumptively followed.  See
> *Mahone*, 294 Mich. App. at 212.

*Bennett*, 2018 WL 1436965, at *5-7.

To be entitled to habeas relief on a prosecutorial misconduct claim, the petitioner must show that the prosecutor's conduct so infected the trial so as to render the conviction fundamentally unfair.  *Parker v. Matthews*, 567 U.S. 37 (2012); *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  If the misconduct was harmless, then as a matter of law, there was no due-process violation.  *See Greer v. Miller*, 483 U.S. 756, 765 & n.7 (1987).  In federal habeas, this means asking whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637-38 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

The Michigan Court of Appeals reasonably found that the prosecutor did not commit misconduct.  With respect to Petitioner's employment history, it was reasonable to conclude that the questioning was a fair response to Petitioner's own testimony that he was gainfully employed at the time of the murder and therefore had no motive to rob the victim.  With respect to the drug use, Resendez testified that she had personal knowledge of Petitioner's drug habit at the time of the crime,

suggesting a monetary motive for the crime. While Petitioner's brother testified that he did not have first-hand knowledge of Petitioner's drug use at the time of the murder, that information was already before the jury. The Michigan Court of Appeals specifically found that the evidence was properly admitted under state law, and this court cannot second-guess that determination on federal habeas review. *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005).

With respect to the closing argument, "[i]t is improper for a prosecutor . . . to bring to the attention of the jury any 'purported facts that are not in evidence and are prejudicial.'" *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995)). Prosecutors, however, have "leeway to argue reasonable inferences from the evidence." *Id*. (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)). Furthermore, improper vouching, as a form of prosecutorial misconduct, "occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the [prosecutor] behind that witness." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999).

The challenged argument did not rely on facts that were not supported by evidence presented at trial or by reasonable inferences that could be drawn from the evidence. Nor did the prosecutor improperly suggest he was personally

24

vouching for the credibility of his witnesses.  The argument focused on the DNA

evidence identifying Petitioner's blood on the victim's belongings, and on

Resendez's recollections.  He argued that Resendez should be believed based on

the content of her testimony, and not based on some secret knowledge he had that

she was telling the truth.  Petitioner's prosecutorial misconduct claim is therefore

without merit.

As none of Petitioner's habeas claims merit relief, the petition will be

denied.

C.    Motion to Stay

Petitioner has also moved to stay or hold the proceedings in abeyance while

the Innocence Project at Western Michigan University Cooley Law School

investigates his claim.  (ECF No. 16).  According to the correspondence attached

to his motion, WMU Cooley Innocence Project, in conjunction with the Michigan

Attorney General Conviction Integrity Unit, will assess whether the physical

evidence in his case can be tested.  *Id*.  A federal district court has discretion to

stay a petition to allow a petitioner to present unexhausted claims to the state

courts and then return to federal court on a perfected petition.  *See Rhines v.

Weber*, 544 U.S. 269, 276 (2005).  Stay and abeyance are available, however, only

in "limited circumstances" such as when the one-year statute of limitations poses a

concern, when the petitioner demonstrates "good cause" for the failure to exhaust

25

state remedies before proceeding in federal court, the petitioner has not engaged in intentionally dilatory litigation tactics, and the unexhausted claims are not "plainly meritless." *Id*. at 277.

Petitioner has not, however, asserted the existence of unexhausted claims that are not plainly meritless. All he has shown is that the state is evaluating whether it will conduct a further investigation regarding the DNA evidence presented in his case. Apparently, Petitioner has asked the State to look into his case, and it has survived initial screening. Petitioner does not combine this potential future investigation with any alleged violation of federal constitutional law. All Petitioner has shown is the potential for some possible future investigation into his case by a law school's innocence project. His allegations are far too speculative at this point to justify a stay of proceedings. Notably, 28 U.S.C. § 2244(b)(2)(B) allows Petitioner to file a future second federal habeas petition in the event the potential investigation actually leads to the discovery of newly discovered evidence supporting a newly available constitutional claim that also demonstrates his actual innocence. For these reasons, the motion to stay is **DENIED**.

## IV.    CERTIFICATE OF APPEALABILITY

In order to appeal the Court's decision, Petitioner must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(2). The applicant is required to show that

reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002). Here, jurists of reason would not debate the Court's conclusion that Petitioner has failed to demonstrate entitlement to habeas relief with respect to his claims because they are devoid of merit. Therefore, a certificate of appealability is denied.

Petitioner is denied permission to appeal *in forma pauperis* because any appeal would be frivolous. 28 U.S.C. § 1915(a)(3).

## V.      CONCLUSION

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, 2) **DENIES** a certificate of appealability, 3) **DENIES** permission to appeal *in forma pauperis*; and **DENIES** Petitioner's motion to stay.

**IT IS SO ORDERED**.

Dated: March 23, 2021                              s/Stephanie Dawkins Davis
                                                   Stephanie Dawkins Davis
                                                   United States District Judge

27